1

2

3

4

5

6

7

8

9      UNITED STATES DISTRICT COURT

10      NORTHERN DISTRICT OF CALIFORNIA

11  | MARGARET A. GONZALES and BILLY JOE
    | PATTON, JR., on behalf of themselves and all        No. C07-2580 TEH
12  | others similarly situated, and one behalf of the
    | general public,                                      DECLARATION OF BETH E.
13  |                                                       TERRELL IN SUPPORT OF
    |                   Plaintiffs,                         PLAINTIFFS' MEMORANDUM OF
14  |                                                       LAW IN OPPOSITION TO
    |         v.                                            DEFENDANTS' MOTION TO STAY
15  |
    | GENERAL MOTORS CORPORATION, a
16  | Delaware corporation, and ONSTAR
    | CORPORATION, a Delaware corporation,
17  |
    |                   Defendants.
18

19

20         I, Beth E. Terrell, am over the age of 18, have personal knowledge of all the facts stated

21  herein, and declare as follows:

22         1.      I am a member of the law firm Tousley Brain Stephens PLLC, attorneys of

23  record for Plaintiffs in this case.

24         2.      Plaintiffs' counsel in this case are successfully coordinating discovery in three

25  separate product defect class actions against Defendant GM in this Court, *Falk v. General*

26  *Motors Corp.*, No. C 07-01731, in Oregon, *Christensen v. General Motors Corp.*,

27

1    No. CV 07-512 HA, and in Washington, *Zwicker v. General Motors Corp.*, No. C07-0291-JCC.

2    This coordinated discovery effort has produced great efficiencies for the parties, particularly

3    Defendant GM, because discovery requests and issues can be addressed in a single telephone

4    conference or meeting, thereby avoiding duplicated efforts.  It is our intention that all future

5    proceedings in this case proceed as efficiently as possible.

6        3.    Attached hereto as Exhibit A is a true and correct copy of "Comments of OnStar

7    Corporation" from *In the Matter of the Year 2000 Biennial Regulatory Review – Amendment of*

8    *Part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules Affecting Cellular*

9    *Radio Telephone Service and Other Commercial Mobile Radio Services*, WT Docket

10    No. 01-108, as posted by the Federal Communications Commission on July 2, 2001.

11        4.    Attached hereto as Exhibit B is a true and correct copy of "Reply Comments of

12    OnStar Corporation" from *In the Matter of the Year 2000 Biennial Regulatory Review –*

13    *Amendment of Part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules*

14    *Affecting Cellular Radio Telephone Service and Other Commercial Mobile Radio Services*, WT

15    Docket No. 01-108, as posted by the Federal Communications Commission on August 1, 2001.

16        5.    Attached hereto as Exhibit C is a true and correct copy of a letter issued by

17    OnStar Corporation Vice President and General Counsel, Mr. Kenneth D. Enborg, and OnStar

18    Corporation Vice President Public Policy, Mr. William L. Ball, to FCC Wireless

19    Telecommunications Bureau Chief, Mr. Thomas Sugrue, referenced as *Re: Ex Parte*

20    *Submission, In the Matter of the Year 2000 Biennial Regulatory Review – Amendment of*

21    *Part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules Affecting Cellular*

22    *Radio Telephone Service and Other Commercial Mobile Radio Services*, WT Docket

23    No. 01-108, as posted by the Federal Communications Commission on  March 29, 2002.

24        6.    Attached hereto as Exhibit D is a true and correct copy of a letter issued by

25    OnStar Corporation Vice President Public Policy, Mr. William L. Ball, to FCC Secretary,

26    Ms. Marlene H. Dortch, referenced as *Re:  In the Matter of the Year 2000 Biennial Regulatory*

27

DECLARATION OF BETH E. TERRELL IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO STAY
NO. C07-2580 TEH
2

4600/001/208628.1

1  *Review – Amendment of Part 22 of the Commission's Rules to Modify or Eliminate Outdated*

2  *Rules Affecting Cellular Radio Telephone Service and Other Commercial Mobile Radio*

3  *Services*, WT Docket No. 01-108; *In the Matter of Revision of the Commission's Rules to*

4  *Ensure Compatibility with Enhanced 911 Emergency Calling Systems*, CC Docket No. 94-102,

5  as posted by the Federal Communications Commission on May 3, 2002.

6      7.    Attached hereto as <u>Exhibit E</u> is a true and correct copy of a letter issued by

7  OnStar Corporation Vice President Public Policy, Mr. William L. Ball, to FCC Secretary,

8  Ms. Marlene H. Dortch, referenced as *Re:  In the Matter of the Year 2000 Biennial Regulatory*

9  *Review – Amendment of Part 22 of the Commission's Rules to Modify or Eliminate Outdated*

10  *Rules Affecting Cellular Radio Telephone Service and Other Commercial Mobile Radio*

11  *Services*, WT Docket No. 01-108, as posted by the Federal Communications Commission on

12  May 22, 2002.

13      8.    Attached hereto as <u>Exhibit F</u> is a true and correct copy of a letter issued by

14  Mr. Jeffrey N. Lüthi, Clerk of the Panel on Multidistrict Litigation, dated June 14, 2007.

15      9.    Attached hereto as <u>Exhibit G</u> is a true and correct copy of the Order issued by

16  The Honorable William Alsup on July 3, 2007, *Falk v. General Motors Corp.*, No. C 07-01731,

17  2007 WL 1970123 (N.D. Cal. 2007).

18      10.    Attached hereto as <u>Exhibit H</u> is a true and correct copy of the Order issued by

19  The Honorable John C. Coughenour on July 26, 2007, *Zwicker v. General Motors Corp.*,

20  No. C07-0291-JCC (W.D. Wash. 2007).

21

22  / / /

23  / / /

24  / / /

25

26

27

DECLARATION OF BETH E. TERRELL IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO STAY
No. C07-2580 TEH

1    I declare under penalty of perjury under the laws of the State of Washington that the

2  foregoing is true and correct.

3        DATED this 13th day of August, 2007.

4                            TOUSLEY BRAIN STEPHENS PLLC

5

6                    By: /s/ Beth E. Terrell, CSB #178181
                         Beth E. Terrell, CSB #178181
7                        bterrell@tousley.com
                         TOUSLEY BRAIN STEPHENS PLLC
8                        1700 Seventh Avenue, Suite 2200
                         Seattle, Washington  98101-4416
9                        Telephone:  (206) 682-5600
                         Facsimile:  (206) 682-2992
10

11                       *Attorney for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF BETH E. TERRELL IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO STAY
No. C07-2580 TEH
4

CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Micki S. Singer
Email:  micki.singer@sdma.com
SEDGWICK, DETERT, MORAN & ARNOLD LLP
One Market Plaza, Steuart Tower, 8th Floor
San Francisco, California  94105
Telephone:    (415) 781-7900
Facsimile:    (415) 781-2635

Amand K. Mines
Email:  amand.mines@sdma.com
Jacqueline M. Jauregui
Email:  jacqueline.jauregui@sdma.com
SEDGWICK, DETERT, MORAN & ARNOLD LLP
801 South Figueroa Street, 19th Floor
Los Angeles, California  90017
Telephone:    (213) 426-6900
Facsimile:    (213) 426-6921

*Attorneys for Defendant*

DATED at Seattle, Washington, this 13th day of August, 2007.

TOUSLEY BRAIN STEPHENS PLLC

By:  /s/  Beth E. Terrell
    Beth E. Terrell, CSB #178181
    bterrell@tousley.com
    1700 Seventh Avenue, Suite 2200
    Seattle, Washington  98101-4416
    Telephone:  (206) 682-5600
    Facsimile:  (206) 682-2992

*Attorneys for Plaintiffs*

DECLARATION OF BETH E. TERRELL IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO STAY
NO. C07-2580 TEH

4600/001/208628.1

— EXHIBIT A —

Before the

**FEDERAL COMMUNICATIONS COMMISSION**

Washington, D.C. 20554

| | | |
|---|---|---|
| **In the Matter of the Year 2000 Biennial** | ) | |
| **Regulatory Review – Amendment of Part 22** | ) | |
| **of the Commission's Rules to Modify or** | ) | **WT Docket No. 01-108** |
| **Eliminate Outdated Rules Affecting Cellular** | ) | |
| **Radio Telephone Service and Other** | ) | |
| **Commercial Mobile Radio Services** | ) | |

**COMMENTS**

**OF**

**ONSTAR CORPORATION**

OnStar Corporation hereby submits these comments on the impact that eliminating the long-standing rules concerning analog standards and availability would have on vehicle manufacturers and occupants of existing and future vehicles equipped with automatic crash and safety notification devices in response to the Commission's specific request contained in Public Notice FCC 01-153 released May 17, 2001 in the above captioned matter.

1

**Background**

OnStar, a wholly owned subsidiary of General Motors Corporation, provides telematics services to the owners of vehicles manufactured by General Motors (Chevrolet, Pontiac, Oldsmobile, Buick, Cadillac, GMC, Saturn, and SAAB) and other automotive manufacturers including Lexus (manufactured by Toyota) and Acura (manufactured by Honda). Subaru, Hummer and Audi (manufactured by Volkswagen) also have announced selected future product programs will offer OnStar. As of April 2001, OnStar was the largest provider of such services with over one million subscribers.

**OnStar's Service Offering Promotes Motor Vehicle Occupant Safety**

The cornerstone of OnStar's service offerings is automatic crash notification (ACN). Immediately following a crash, the vehicle initiates a call over the analog cellular network to the OnStar Call Center. That call first transmits both vehicle and GPS-based location data and then switches to voice to allow an advisor at the Call Center to attempt to talk to the occupants. As required, the advisor will contact, and if possible, conference the vehicle occupants with, the appropriate public safety answering point (PSAP) for an emergency response.

In addition to ACN, OnStar offers other emergency, safety, security and information services.[1]

---

[1] See www.onstar.com for a complete list and explanation of offered services

**Hands Free, Voice Activation Minimizes Distracted Driving**

An important feature of the OnStar System in providing all of its telematics services is that there is no handset. It is "hands-free" and "voice-activated" so that concerns about driver distraction can be minimized.

In recent months, the public policy concerns about distracted driving have increased. As of February 26, 2001 there were approximately 106 bills in 39 states raising concerns about the use of hand-held cell phones in vehicles. On June 28, 2001, New York became the first state to enact a ban on the use of hand-held cell phones while driving. In May 2001, bills were introduced in the U.S. Senate and House of Representatives seeking to address the issue.

OnStar believes there is a clear public interest in avoiding regulatory actions that might have the unintended effect of reducing drivers' options - such as OnStar - to minimize the potential distraction associated with the use of a cell phone while driving.

**Nationwide Availability of Automatic Crash and Other Emergency Notification Saves Lives and is in the Public Interest**

OnStar expects to have over 4 million subscribers by 2003. Currently, OnStar receives over 120 air bag deployment notifications per month as well as a number of other emergency response requests and expects this number to grow as the number of subscribers increases. By providing to the appropriate PSAP, timely notice, exact vehicle location and any information from the vehicle occupants learned during the voice

3

conversation, OnStar is able to accelerate the delivery of critical emergency services to the accident scene.

Dr. Howard R. Champion, Research Professor of Surgery, University of Maryland, reports:

> "The goal in trauma care is to get seriously injured patients to a trauma center for diagnosis, critical care and surgical treatment within the 'Golden Hour' "[2] (the first 60 minutes following the crash)

According to Dr. Champion:

> "Currently, of the 42,000 crash deaths each year, nearly 20,000 victims die at the scene. At the scene, about 13,500 people die from injuries in rural crashes and about 6,500 in urban crashes. Of the 22,000 crash deaths that are taken to hospital many die because they arrive too late. Thousands of crash deaths occur each year in which the victim did **not** arrive at a hospital - much less at a trauma center within the 'Golden Hour.'… In the future, ACN will reduce many of the longer times dramatically. With ACN, **all** crash notification times, not just **average** notification times will be reduced to about **one minute**. [3]"

Congress recognized the daily life saving capability of OnStar and similar wireless nationwide services and moved to support them, for example, in the E-911 legislation. In that legislation's statement of findings and purpose, Congress found that:

> "(5) emergency care systems, particularly in rural areas of the Nation, will improve with the enabling of prompt notification of emergency services when motor vehicle crashes occur;
> (6) the construction and operation of <u>seamless, ubiquitous, and reliable</u> (emphasis added) wireless telecommunications systems promote public safety and provide immediate and critical communications links among members of the public, emergency medical service providers and emergency dispatch providers; public safety, fire service and law enforcement officials, and hospital emergency and trauma care facilities."

---

[2] Dr. Howard R. Champion, *Reducing Highway Deaths and Disabilities with Automatic Wireless Transmission of Serious Injury Probability Ratings from Crash Recorders to Emergency Medical Services Providers*, International Symposium on Transportation Recorders, May 3-5, 1999.

OnStar believes these findings are particularly relevant to this proceeding.

**Analog Offers Robust Capabilities Not Currently Matched by Other Technologies**

OnStar employs an analog cellular-based system that is embedded in the vehicle. There is no handset. OnStar selected analog wireless technology because of the technology's nationwide availability and well-defined technical standards. These are critical considerations in the motor vehicle industry with its nationwide product offering, the obvious mobility of the product in use and an <u>average</u> vehicle life of about 8 years.

Importantly, for the cornerstone application of ACN and provision of emergency services, analog offers the ability to transmit data and voice on the same call. Once a voice channel connection is established, frequency-modulated data is transmitted on that channel to the call center. This data includes reason for the call (e.g. airbag deployment), location of the vehicle, vehicle identity and in the future will include crash impact data. The call is then switched to a voice mode and conversation between the call center and vehicle occupants takes place.

The digital standards do not allow for this type of call – alternatives have been discussed yet the robustness analog offers is not available. Some of the data transports being discussed for an airbag deployment call include:

- A circuit-switched data call, followed by a tear down of the data call and the set up of a voice call;

- SMS data with a voice call; and

---

[3] Id.

- Proprietary, non-standard based modulation schemes for sending data over the digital voice channel.

While all these types of calls may be possible, none are nearly as robust as the basic analog voice and data in the same call. OnStar recommends that a standard form of communication for voice and data be developed for emergency services within digital.

**Retention of Standardized Analog Service is Critical to Public Safety**

OnStar believes it is premature for the Commission to eliminate the analog availability requirement and the supporting compatibility standards as there is no single, technically standardized nationwide alternative. Moreover, when the Commission determines that such an alternative is available and it is appropriate to change the current rules, OnStar believes that the Commission must take into account two factors. First, there is a large fleet of legacy vehicles that only have analog calling capability. While the average life of a car today is 8-9 years and 7-8 years for a truck, vehicles are designed for a life of double that time[4]. Indeed, as of July 1999, nearly 40 percent of the vehicles on the road were over 10 years old.[5]

Second, if a change is to take place, the length of the vehicle development cycle (the length of time it would take vehicles manufacturers to design in, validate and build compatible vehicles) needs to be accommodated. As a vehicle-based system, it necessarily must be, and is designed, engineered and validated to motor vehicle standards for operation in a wide range of climatic conditions and road conditions; for

---

[4] Ward's Motor Vehicle Facts &Figures 2000 pp44-45.
[5] Ibid.

electromagnetic compatibility; and life of the vehicle durability and reliability. Typically, this takes about three years but implementing a change over an entire fleet may take longer as all vehicles are not redesigned each year.

The life saving benefits of OnStar are intended not only for initial vehicle purchasers but also for subsequent owners over the life of the vehicle. Thus, without a phased reduction over a large number of years, the Commission action would potentially jeopardize the lifesaving capability of OnStar and other similar telematics providers of ACN and emergency services.

**Standardization is a Vital Element in Maintaining a Nationwide System**

The importance of standardization should not be underestimated. Without it, future systems cannot be confidently designed nor offered with the assurance that the automatic crash and emergency notification features will connect with the nation's wireless telecommunication system over the life of the vehicle. OnStar is an embedded system integral to the vehicle's electrical architecture and validated to the rigors of the motor vehicle environment. The system monitors the vehicle electrical bus to detect an air bag deployment or other similar automatic emergency triggering event so that a data message can be formulated and a call placed to one of the OnStar Centers. For reasons of overall electrical architecture integrity, telematics components are not designed for periodic replacement.

Perhaps at some future time, if a "software defined radio" is successfully designed and can be validated for the motor vehicle environment, greater flexibility will exist. While OnStar is exploring digital designs and options, digital technology today is neither available nationwide nor sufficiently standardized to meet the life of the vehicle requirement for providing automatic crash notification and other emergency safety and security services.

Thus, OnStar advocates the continued standardization of cellular requirements such as antenna performance. In order to deliver the most robust in vehicle system that works across all cellular systems, telematics requires rigorous and exact performance standardization. Local market variation such as broadcast wave polarization sub-optimizes overall performance nationwide. Therefore, OnStar cannot support proposed changes to Part 22.367, Part 22.915, Part 22.917, Part 22.901(d)(2) and Part 22.905.

**Analog is an Essential Component for a True Nationwide Network**

OnStar is concerned that the Notice in this matter understates the reliance of the nations' wireless system on analog availability and the Part 22 rules. While statistics show that the nations' cell phone users are increasingly shifting to digital phones, in fact there is no nationwide wireless system without analog. Analog is the "glue" that holds the system together by enabling nationwide roaming. There is no true nationwide digital network. One hundred percent of digital phones that offer true nationwide service are also analog.

Under these circumstances, OnStar supports the retention of Part 22.901(b). Moreover, OnStar recommends that the Commission should consider designing incentive strategies to support carriers continuing to provide adequate availability of analog service.

**Conclusion**

In summary, all OnStar vehicle customers are and, for the foreseeable future, will be AMPS customers. The reasons provided by the Commission for adopting the Part 22 rules (Para.7, NPRM) are still valid today. Nationwide technical compatibility and availability of AMPS is important to motor vehicle safety. The analog system was selected by OnStar and other telematics service providers because it is the only common standard in the US - because of the FCC rule it is available everywhere and there is forward and backward compatibility. OnStar and other providers of telematics services have relied on ongoing AMPS compatibility and availability and it is premature and potentially injurious to the health and welfare of the motoring public to begin phasing down the system without an as carefully crafted successor strategy.

Respectfully submitted,

Kenneth D. Enborg
  Vice President and General Counsel
  248-588-3522

William L. Ball
  Vice President-Public Policy
  248-588-2815

1400 Stephenson Highway
Troy, MI 48083-1189

9

— EXHIBIT B —

Before the

**FEDERAL COMMUNICATIONS COMMISSION**

**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of the Year 2000 Biennial )<br>Regulatory Review – Amendment of Part 22 )<br>of the Commission's Rules to Modify or )<br>Eliminate Outdated Rules Affecting Cellular )<br>Radio Telephone Service and Other )<br>Commercial Mobile Radio Services ) | **WT Docket No. 01-108** |

**REPLY COMMENTS**

**OF**

**ONSTAR CORPORATION**

OnStar Corporation, a wholly owned subsidiary of General Motors Corporation, hereby submits

these reply comments on behalf of itself and General Motors on the impact that eliminating the

long-standing rules concerning analog standards and availability would have on vehicle

manufacturers and occupants of existing and future vehicles equipped with telematics devices

providing automatic crash and safety notification and other information and telecommunication

1

services in response to the Commission's specific request contained in Public Notice FCC 01-153 released May 17, 2001 in the above captioned matter.

**Nationwide Roaming Depends on Maintaining a Common AMPS Channelization Standard**

Virtually all, if not all, commentators agreed that the nation's digital wireless network is not yet sufficiently built out to support any short-term elimination of the Advanced Mobile Phone Service (AMPS) standard. AMPS continues to be the foundation for a nationwide wireless mobile telecommunications system. Necessarily, therefore, the Commission should proceed with great caution with respect to eliminating the supporting technical standards, which could have the unintended effect of undercutting the nationwide AMPS system depending on the business strategies and decisions of individual carriers. While some commentators argued for the immediate elimination of rules related to channelization and antenna wave polarization, OnStar believes the Commission received better recommendations from those commentators who supported the retention of the current rules.

The current channelization rules are a lynch pin for nationwide roaming. Regulatory symmetry and the fact that PCS does not have such rules are not reason enough to eliminate these rules. While AMPS and digital formats may compete in urban markets, there is no credible nationwide service except through AMPS roaming. Elimination or modification of the channelization rules risks carriers developing unique channelization schemes based on internal considerations without adequate consideration of the national

2

need to support roaming. For the reasons set out in OnStar's initial comments, roaming

capability is fundamental to the ability of OnStar; General Motors and other vehicle

manufacturers; and other telematics providers to continue to reduce deaths and injury on

the nation's highways using automatic crash notification (ACN) in current and future

vehicles as well as those already on the roads today.


**Eliminating Wave Polarization Standards Risks Compromising ACN Performance**

Continuation of the antenna wave polarization rules is also important to the health of a

nationwide system. As discussed in OnStar's July 2, 2001 filing, a critical requirement in

the automotive application of telecommunications is standardization because of the lead

times for validation, the product life and inherent mobility of the product. The current

standards have provided this vital stability.


While some commentators speculated that antenna tower deployments might be "more

aesthetic"[1] or potentially less costly, this must be weighed against the fact that any

change will compromise the performance of hand set and vehicle antennas in use today

by potentially reducing the RF footprint of any given cell site relative to those antennas.

For OnStar, this reduction would have the consequence of compromising the

effectiveness of automatic crash notification compared to today. Specifically, the range

of systems in vehicles on the road and those in design would be compromised.

Moreover, without an immediate successor standard, there would be no basis for

---

[1] Comments filed by Cingular Wireless LLC July 2, 2001 at p.ii

3

engineering for antennas on vehicles in design, with the prospect that antennas on those vehicles would be sub-optimized and therefore less efficient in accomplishing telematics' cornerstone service of automatic crash notification and provision of emergency services.

### The Unmatched Coverage and Technical Stability and Capability of AMPS are required for ACN

Looking beyond the short term, OnStar continues to believe that other commentators failed to convincingly support their recommendation that a sunset date be established for AMPS. A number of these commentators suggested that the existence of competition at the local level was evidence that the AMPS requirement could be eliminated. OnStar believes these commentators are overlooking the fact that to achieve nationwide roaming, consumers are 100% dependent on the nation's analog system.

As noted in OnStar's earlier filing, analog is the "glue" that holds today's multimode, multi-band system together. Its stability - anchored in the Commission's AMPS rules - is what allows the Commission the confidence to permit the various carriers to experiment with differing digital technologies and strategies. Moreover, its stability has enabled vehicle manufacturers to bring telematics services like automatic crash notification to consumers. As noted earlier, the automotive environment requires such stability to continue to provide this demonstrated life saving service. And until digital technology demonstrates sufficient stability whether achieved by market forces or by regulation, digital technology cannot be a substitute for analog in these lifesaving telematics

4

applications.  An important advantage of analog is its lower embedded vehicle hardware cost relative to digital technology, thus supporting the rapid penetration of automatic crash notification beyond luxury automotive applications and into mainstream car and truck applications.

In addition none of the commentators demonstrated the existence of any robust comparable alternative in the digital format to the capability of analog technology to transmit voice and data on the same call.  As noted in OnStar's earlier submission the transmission of voice and data is an inherent requirement of automatic crash notification and the provision of emergency and other location-based services.

**Maintaining AMPS is Consistent with Congressional Intent**

The Congressional intent underlying the 1993 amendments to the Communications Act of 1934 cited by several commentators must be balanced with consideration of the more recent enactment of the Wireless Communications and Public Safety Act of 1999.  The findings underlying that legislation and its stated purpose support the Commission in maintaining analog and its supporting technical standards until a demonstrated, built out alternative is available.[2]

---

[2] Wireless Communications and Public Safety Act of 1999, Section 2

Congress found that "…(6) the construction and operation of seamless, ubiquitous, and reliable wireless telecommunications systems promote public safety…"[3] and declared its purpose "to encourage and facilitate the prompt deployment throughout the United States of a seamless, ubiquitous, and reliable end-to-end infrastructure for communications, including wireless communications, to meet the Nation's public safety and other communications needs."[4]  The Commission is directed to "encourage and support efforts by the states to deploy comprehensive end-to-end emergency communications infrastructure and programs including seamless, ubiquitous, and reliable wireless telecommunications networks…."[5] The role of ACN is recognized in ensuing direction to the Commission to consult with the motor vehicle industry and in provisions related to the use of automatic crash notification information.[6]  All of OnStar's motor vehicle subscribers rely upon AMPS for ACN.  In accomplishing the directive to the Commission, therefore, maintaining AMPS is essential.  As demonstrated in OnStar's July 2, 2001 comments and these reply comments no digital network has the capability of AMPS to support the public safety goal of this legislation.


**Conclusion**

OnStar believes that the case for the changes proposed in the NPRM has not been adequately supported in the record.  The Commission has performed an important service with this inquiry and fulfilled its mandate to review rules of long standing.  In this

---

[3] Id. Section 2(a)
[4] Id. Section 2(b)
[5] Id. Section 3(b)
[6] Id. Sections 3(b) and 5(2)

6

instance, however, OnStar believes the record demonstrates that the existence of a nationwide wireless mobile telecommunication system and the benefits of that system including the demonstrated life saving potential of telematics is dependent upon the continuation of AMPS and the associated rules and standards.  It would be unfortunate if the foundation and thereby the life saving and other benefits of the current nationwide system were to be put at risk

Respectfully submitted,

Kenneth D. Enborg
  Vice President and General Counsel
  248-588-3522

William L. Ball
  Vice President-Public Policy
  248-588-2815

1400 Stephenson Highway
Troy, MI 48083-1189

August 1, 2001

— EXHIBIT C —

Mr. Thomas Sugrue
Chief
Wireless Telecommunications Bureau
Federal Communications Commission
445 12th Street SW
Washington, D.C. 20554

Re: *Ex Parte* Submission, *In the Matter of the Year 2000*
*Biennial Regulatory Review - Amendment of Part 22 of the*
*Commission's Rules to Modify or Eliminate Outdated Rules*
*Affecting Cellular Radio Telephone Service and Other*
*Commercial Mobile Radio Services*
WT Docket No. 01-108

Dear Mr. Sugrue:

As set out in OnStar's earlier filings in this matter (July 2, 2001 and August 2, 2001), OnStar is

an in-vehicle telecommunications system included as standard or optional equipment on models

sold by General Motors and Acura (Honda) as well as Lexus (under the system name Lexus

Link, Toyota). In April 2002 Audi (Volkswagon) will launch OnStar service beginning with its

new A4.

The purpose of this OnStar filing is to update the data in the earlier filings to reflect the

significant continued growth owing to vehicle sales in the last half of 2001 as well as the first

part of 2002 and the consequent increase in subscribers and system utilization. In addition this

filing discusses OnStar's digital rollout plan and concerns about assuring service to the owners of

the legacy analog fleet once digital technology is rolled out.

At the end of February 2002, there were approximately 2.1 million OnStar subscribers. As noted in the earlier filing, OnStar's cornerstone service is automatic crash notification. At the end of February 2002, OnStar was receiving approximately 500 automatic airbag deployment or crash notifications per month. Our incident tracking indicates that in over 60% of these incident types, OnStar's call was the first call received by the PSAP.

As additionally noted in the earlier filing, OnStar's integration into the electrical architecture of the vehicle also creates the opportunity to deliver a variety of unique safety and security services including stolen vehicle location, remote door unlock and remote diagnostics in the event of vehicle problems including for example engine, transmission, antilock braking or airbag system problems. By the end of the 2001, OnStar was averaging in a month over 375 stolen vehicle location requests, 15,000 door unlock requests and 15,000 roadside assistance and remote diagnostics requests.

As also noted in OnStar's earlier filings, the delivery of these services is dependent upon the ability to transmit voice and data on the same call.[1] OnStar is actively working with suppliers to

---

[1]  In that filing OnStar noted: "Importantly, for the cornerstone application of ACN and provision of emergency services, analog offers the ability to transmit data and voice on the same call. Once a voice channel connection is established, frequency-modulated data is transmitted on that channel to the call center. This data includes reason for the call (e.g. airbag deployment), location of the vehicle, vehicle identity and in the future will include crash impact data. The call is then switched to a voice mode and conversation between the call center and vehicle occupants takes place.

"The digital standards do not allow for this type of call – alternatives have been discussed yet the robustness analog offers is not available. Some of the data transports being discussed for an airbag deployment call include:
- A circuit-switched data call, followed by a tear down of the data call and the set up of a voice call;
- SMS data with a voice call; and
- Proprietary, non-standard based modulation schemes for sending data over the digital voice channel.

While all these types of calls may be possible, none are nearly as robust as the basic analog voice and data in the same call. OnStar recommends that a standard form of communication for voice and data be

2

engineer a robust digital solution to this requirement. Digital implementation in an embedded automotive environment requires a distinct development effort from a digital handset. For example, because emergency services are a cornerstone service, coverage and successful first time call placement reliability are critical factors. Thus, to maximize RF coverage, especially in rural areas, the system is being designed to utilize 3-watt analog and .6 watt digital power levels. In addition the automotive environment requires a more discriminating hands free processing system - also, call reliability algorithms to support emergency calls are more sophisticated. Further, as an embedded automotive system with emergency services capability the hardware must be validated to operate in the wide range of conditions experienced by a vehicle over its life. Considerations include temperature, humidity, dust and electromagnetic interference.

Assuming OnStar's suppliers are able to adhere to their technology development schedules, OnStar expects to begin phasing-in units with digital capability in the 2004 Model Year. Because OnStar is integrated into the electrical architecture of the vehicle, changes such as the transition to digital involve significant engineering modifications. Necessarily automotive manufacturers are not equipped to reengineer the electrical architecture of a large number of models in a single year. In addition, good technology risk management practice avoids implementing new technology across a large portion of a manufacturer's line-up in a single year - given the significant customer image and economic consequences of any recall - especially as affects safety oriented systems such as OnStar. Thus the expected phase-in for digital hardware

---

developed for emergency services within digital." OnStar Comments, July 2, 2002, WT Docket No.01-108 at pp.5-6.
One integral part of this engineering problem is that OnStar's subscriber base is large enough to require multiple call centers. Necessarily, the voice part of the call and the data part of the call must be reliably matched to arrive at the same time (i.e. without latency) not only at the same advisor workstation but also at the same call center. Multiple call centers also provide redundancy in the event of an outage at one center.

is over a three model year time frame (2004,2005, 2006). OnStar expects the conversion to digital to be complete with the end of the 2006 model year[2].

If the Commission uses this proceeding to establish or propose a phase out for AMPS, OnStar urges the Commission take into account the consequences for the initial owners as well as the second and subsequent owners of the fleet of vehicles with installed analog systems. By the end of the 2006 Model Year, OnStar estimates the industry installed analog base is likely to be six to seven million vehicles. OnStar believes any Commission action establishing a phase out for the analog compatibility requirement should permit these consumers the maximum opportunity to secure the safety, security and other benefits from their investment before implementing regulatory changes that could potentially strand that investment. Existing embedded automotive systems are not susceptible to being easily replaced with digital technology and compatible antennas. With the ownership of a new vehicle averaging three to four years for lessees and five to six years for purchasers, the five-year time frame proposed by some commentators in this proceeding is insufficient to allow even the first owners of 2005 or 2006 model year vehicles with analog systems any substantial benefit from the safety and security features provided by their embedded telematics systems. [3]

OnStar believes that the Commission's compatibility rule continues to be necessary given the structure of the wireless industry. For example, OnStar has been unable to negotiate contracts with some carriers to provide analog service to OnStar and its customers on other than a roaming

---

[2] Typically, the last 2006 model year vehicles in dealer inventory would be expected to be sold by December 31, 2006. Model years generally run from October 1 of the prior year to September 30 of the year in question (e.g. The 2006 model year will run from October 1, 2005 to September 30, 2006).

basis. This has precluded OnStar from being able to offer the additional safety of its hands-free voice-activated calling service (OnStar Personal Calling) to subscribers living in the areas where those carriers hold both the A and B side 800 MHz licenses and includes some major metropolitan areas in Florida, Texas and Oklahoma.

OnStar believes the biennial review of the analog compatibility standard has raised important technological and policy issues involved in the transition to digital wireless communication. As explained in OnStar's comments, the transition involves development (which is underway) of new technology to support the capability of embedded telematics. OnStar continues to be concerned for reasons set out in its initial comments that it is premature to establish a sunset for the analog compatibility requirement[4]. Nevertheless, OnStar urges the Commission that if it decides to proceed with establishing a sunset date to look at least three to five years beyond the five year timeframe suggested by some comments and thereby take into consideration the automotive ownership cycles and product and life cycles of this demonstrated life saving technology.

Respectfully submitted,

Kenneth D. Enborg
  Vice President and General Counsel
  248-588-3522

William L. Ball
  Vice President – Public Policy
  248-588-2815

OnStar Corporation
1400 Stephenson Highway
Troy, MI 48083-1189

---

[3]Where General Motors offers OnStar as a unique option feature, the price is $695. That price includes the first year of "Safe and Sound" service valued at $200
[4] OnStar notes that the Commission recently granted a requested waiver regarding analog antenna polarization standards to Cingular, which should relieve some of that carrier's concerns about capacity. See Order March 7, 2002 DA 02-558

March 29, 2002

— EXHIBIT D —

May 2, 2002

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C. 20554

|  |  |  |
|---|---|---|
| Re: In the Matter of | ) | |
| Year 2000 Biennial Regulatory Review -- | ) | **WT Docket 01-108** |
| Amendment of Part 22 of the Commission's | ) | |
| Rules to Modify or Eliminate Outdated Rules | ) | |
| Affecting the Cellular Radiotelephone Service | ) | |
| And Other Commercial Mobile Radio Services | ) | |
| | | |
| In the Matter of | ) | |
| Revision of the Commission's Rules to Ensure | ) | **CC Docket No. 94-102** |
| Compatibility with Enhanced 911 Emergency | ) | |
| Calling Systems | ) | |

Dear Ms. Dortch:

Pursuant to Section 1.1206 of the Commission's rules, William L. Ball, Vice President Public Policy, and Steven P. Schwinke, Director Systems Operations, representing the OnStar Corporation, submit this notice in the above-captioned proceedings of an ex parte meeting on May 1,2002, with Patrick Forster, Senior Engineer, Daniel Grosh, Jennifer Salhus, Jennifer Tomchin and Patrick Webre all with the Wireless Telecommunications Bureau Policy Division and from the International Bureau, Arthur Lechtman. The purpose of the meeting was to demonstrate the operation of the OnStar system.

As part of the demonstration, it was explained that OnStar combines cellular communications with GPS technology and integrates them into the electrical architecture of the vehicle. OnStar's service offerings were reviewed including OnStar Personal Calling, Virtual Advisor and OnStar call center services including automatic crash/airbag deployment notification and other emergency services. OnStar's transition to digital technology was discussed. As a part of this discussion, it was noted that OnStar is currently an analog based service. More specifically it was noted that analog is the state-of-the-art for the transmission of data and voice on the same call because there is currently no standard or robust method in digital

2

networks to discriminate between data and voice on the same call.[1] This capability is required in offering automatic airbag deployment notification, emergency and other location-based services that are the cornerstone of OnStar's embedded telematics offering.  The capabilities of the OnStar system to contact public safety answering points directly and through the OnStar call center were reviewed.

Please direct any questions regarding this matter to the undersigned.

Respectfully submitted,

William L. Ball
Vice President, Public Policy

OnStar Corporation
1400 Stephenson Highway
Troy, Michigan  48083-1189
248-588-2815

---

1 This issue is described in more detail in the July 2, 2001 comments, August 1, 2001 reply comments and ex parte of March 28, 2002 filed by OnStar in FCC Docket No. WT 01-108.

— EXHIBIT E —

May 21, 2002

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C. 20554

           Re: In the Matter of                    )
           Year 2000 Biennial Regulatory Review --     )     **WT Docket 01-108**
           Amendment of Part 22 of the Commission's  )
           Rules to Modify or Eliminate Outdated Rules  )
           Affecting the Cellular Radiotelephone Service  )
           And Other Commercial Mobile Radio Services  )

Dear Ms. Dortch:

Pursuant to Section 1.1206 of the Commission's rules, Chet Huber, President; William L. Ball, Vice President Public Policy; and Steven P. Schwinke, Director Systems Operations, representing the OnStar Corporation, submit this notice in the above-captioned proceeding of an ex parte meeting on May 20, 2002, with James Schlichting, Deputy Chief; Roger Noel, Deputy Chief Commercial Wireless Division; and Linda Chang all with the Wireless Telecommunications Bureau. The purpose of the meeting was to discuss OnStar's position regarding the analog compatibility standard.

      The meeting opened with a brief explanation that OnStar combines cellular communications with GPS technology and integrates them into the electrical architecture of the vehicle. OnStar's service offerings were reviewed including OnStar Personal Calling and OnStar call center services including automatic crash/airbag deployment notification (ACN) and other emergency services. OnStar's transition to digital technology was discussed. As a part of this discussion, it was noted that OnStar is currently an analog based service. More specifically it was noted that analog is the state-of-the-art for the transmission of data and voice on the same call because there is currently no standard or robust method in digital networks to discriminate between data and voice on the same call.[1] This capability is required in offering automatic airbag deployment notification, emergency and other location-based services that are the cornerstone of OnStar's embedded telematics offering as well as in transmitting data to support remote diagnostics and other capabilities. OnStar noted that its initial system included a TDMA

---

[1] This issue and the others discussed are described in more detail in the July 2, 2001 comments, August 1, 2001 reply comments and ex parte of March 28, 2002 filed by OnStar in FCC Docket No. WT 01-108.

2

implementation but that the TDMA mode was never capable of transmitting emergency calls because of the inability to discriminate between the data and voice portions of emergency calls and was eventually disabled to protect the ability of the system to complete emergency calls.

OnStar discussed its digital development and rollout strategy. The discussion noted that in addition to working to solve the data and voice problem, OnStar's embedded digital development targets are more complex than a handset because of the need to maximize the probability of completing an emergency or ACN call and the automotive environment in which the system operates. Examples of the special development targets were discussed including a development target of 3-watt analog capability while adding the 0.6-watt digital capability. The importance of nationwide coverage to telematics was also discussed.

In addition, OnStar expressed the belief that any change to the analog compatibility standard should also take into account the investment by the owners of the current fleet of vehicles with analog systems. OnStar reiterated its recommendation that the Commission should not take action that would potentially strand that consumer investment before the owners have an opportunity to benefit from the investment for a reasonable period of time considering the average ownership and lease periods of vehicles over their product life.

Please direct any questions regarding this matter to the undersigned.

Respectfully submitted,

William L. Ball
Vice President, Public Policy

OnStar Corporation
1400 Stephenson Highway
Troy, Michigan  48083-1189
248-588-2815

— **EXHIBIT F** —

# UNITED STATES OF AMERICA
## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

**CHAIRMAN:**
Judge Wm. Terrell Hodges
United States District Court
Middle District of Florida

**MEMBERS:**
Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

Judge David R. Hansen
United States Court of Appeals
Eighth Circuit

Judge Anthony J. Scirica
United States Court of Appeals
Third Circuit

**DIRECT REPLY TO:**
Jeffery N. Lüthi
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone:  [202] 502-2800
Fax:         [202] 502-2888

http://www.jpml.uscourts.gov

June 14, 2007

### NOTICE OF HEARING SESSION

Dear Counsel:

Pursuant to the order of the Judicial Panel on Multidistrict Litigation filed today, you are hereby notified that a hearing session has been scheduled to consider various matters pursuant to 28 U.S.C. § 1407.

DATE OF HEARING SESSION:          July 26, 2007

LOCATION OF HEARING SESSION:     United States Courthouse
                                 15th Floor Courtroom
                                 300 South Fourth Street
                                 Minneapolis, Minnesota  55415

TIME OF HEARING SESSION:  In those matters designated for oral argument, counsel presenting oral argument must be present at **8:30 a.m.** in order for the Panel to allocate the amount of time for oral argument. Oral argument will commence at **9:30 a.m.**

Please direct your attention to the enclosed Hearing Session Order and Schedule of Matters for Hearing Session for a listing of the matters scheduled for consideration at this hearing session.

- Section A of this Schedule lists the matters designated for oral argument.
- Section B of this Schedule lists the matters that the Panel has determined to consider **without oral argument**, pursuant to Rule 16.1(c), R.P.J.P.M.L., 199 F.R.D. 425, 439 (2001).

For those matters listed on Section A of the Schedule, the enclosed blue "Notice of Presentation or Waiver of Oral Argument" must be returned to this office no later than **July 9, 2007.**  Note the procedures governing Panel oral argument which are outlined on the enclosed "Procedures for Oral Argument before the Judicial Panel on Multidistrict Litigation."  These procedures are strictly adhered to and your cooperation is appreciated.

Very truly,

Jeffery N. Lüthi
Clerk of the Panel

c:  Clerk, U.S. District Court for the District of Minnesota

— EXHIBIT G —

1
2
3
4
5
6               IN THE UNITED STATES DISTRICT COURT
7
8          FOR THE NORTHERN DISTRICT OF CALIFORNIA
9

10   ROY FALK, LEE KRATZER and BARBARA          No. C 07-01731 WHA
11   McRAE, on behalf of themselves and all others
     similarly situated,
12          Plaintiffs,                          **ORDER ON MOTION**
13      v.                                       **TO DISMISS**
14   GENERAL MOTORS CORPORATION, a
15   Delaware Corporation
16          Defendant.
                                            /
17

18                        **INTRODUCTION**

19      In this putative class action against General Motors Corporation, plaintiffs bring suit for

20   defective speedometers in their GM trucks and sports utility vehicles, alleging violations of

21   California's Consumers Legal Remedies Act and Unfair Competition Laws. Plaintiffs also

22   allege damages due to fraud by omission and unjust enrichment. Defendant's motion to dismiss

23   for failure to state a claim under Rules 12(b)(6) and 9(b) is hereby **DENIED** as to the CLRA, UCL

24   and fraud by omission claims and **GRANTED** as to the unjust enrichment claim.

25                        **STATEMENT**

26      Plaintiffs are California residents who purchased trucks or sport utility vehicles from GM

27   between 2003 and 2007. In the case of each plaintiff, the speedometer on his or her vehicle

28   ceased to function properly after the expiration of the vehicle's warranty. Plaintiffs claim

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    damages suffered on account of these broken speedometers.

2        Plaintiff Ray Falk purchased a new GMC Sierra from a dealer in 2003. In February of

3    2007, after driving approximately 45,000 miles, Falk noticed that his speedometer was sticking,

4    moving in jerky increments, and reading incorrect speeds. Falk claims that the speedometer

5    would register a speed of 20 miles per hour while he was completely stopped but would read 120

6    miles per hour while he drove at the speed of traffic. When Falk brought his car to a dealership,

7    he was told that he would have to pay $500 to repair his speedometer (Compl. ¶ 7).

8        Plaintiff Lee Kratzer purchased a new GMC Yukon XL in 2003. In early 2007, after

9    driving 46,000 to 47,000 miles, Kratzer's speedometer failed. Kratzer states that when his

10   vehicle was stopped, the speedometer would read 120 miles per hour; when driving on the

11   freeway, however, the speedometer sometimes read a speed of five miles per hour. Kratzer

12   brought the car to a dealer, who also asked for $500 to repair Kratzer's speedometer, but Kratzer

13   negotiated a price of $100 to fix the problem (id. at ¶ 8).

14       Plaintiff Barbara McRae bought a 2004 Chevy Tahoe in April of 2004. In March of

15   2007, McRae claims that she saw her speedometer reading 120 miles per hour while she was

16   driving at normal traffic speeds on the freeway. Her dealer told her that, since she had driven

17   54,000 miles, her speedometer was no longer covered by warranty. McRae therefore agreed to

18   pay $325 to have her speedometer replaced (Compl. ¶ 9).

19       In the complaint, plaintiffs present a number of consumer postings on the Internet which

20   detailed consumer problems with GM speedometers. In many of the postings, car repair shops

21   were quoted as saying that the entire instrument cluster panel would have to be replaced.

22   Several of the postings referenced "hundreds of similar complaints," and some of the postings

23   concluded that there must be a "widespread problem with similar GM models." In many, the

24   customers indicated that their speedometer problems were intermittent. Some could be fixed by

25   "stopping and restarting the car," others were "more noticeable in the 55 to 75 mph range," and

26   some were just "erratic." Many of the consumers who posted complaints stated that they called

27   GM to complain, but that GM provided no information beyond a referral to the nearest GM

28

2

United States District Court
For the Northern District of California

1   dealer.  In the cases where the customer did bring their car to a mechanic, the customer was often

2   charged several hundred dollars to repair their vehicle (Compl. ¶ 21).

3        Although plaintiffs raise a number of claims relating to the allegedly defective nature of

4   GM's speedometers, plaintiffs do not rely on any warranty or strict products liability theories.

5   Rather, plaintiffs rely on the tort proposition that GM knowingly sold vehicles with defective

6   speedometers.  Plaintiffs first allege that GM violated the California Consumers Legal Remedies

7   Act, Cal. Civ. Code § 1750(a)(5) & (7) when it "represented that its Trucks and speedometers in

8   its Trucks had characteristics and benefits that they do not have, and represented that its Trucks

9   and speedometers in its Trucks were of a particular standard, quality or grade when they were

10   another."  In support of this argument, plaintiffs allege that "Defendant knew that its Trucks and

11   speedometers were defectively designed or manufactured, would fail prematurely and were not

12   suitable for their intended use" (Compl. ¶¶ 43, 45).

13        Plaintiffs also allege that defendant violated California's Unfair Competition Law,

14   California Business and Professions Code § 17200, *et seq.*, which bars "unfair competition" such

15   as an "unlawful, unfair or fraudulent business act or practice" or "unfair, deceptive, untrue or

16   misleading advertising" (Compl. ¶ 54).

17        Additionally, plaintiffs plead a claim of fraud by omission, based on defendant's alleged

18   knowledge that "the speedometers installed in its Trucks were defectively designed or

19   manufactured, would fail prematurely, and were not suitable for their intended use," and

20   defendant's alleged concealment of this information.  Finally, plaintiffs raise a claim of unjust

21   enrichment based on GM's alleged enrichment at the expense of its customers in California

22   (Compl. ¶¶ 64–65).

23        The complaint was filed as a class action on March 27, 2007, on the behalf of all

24   California residents who had purchased or leased certain GM trucks and sport utility vehicles

25   between 2003 to 2007.  Defendant GM filed this motion to dismiss pursuant to Rules 12(b)(6)

26   and 9(b).  Subject-matter jurisdiction is appropriate here under 28 U.S.C. 1391(c), because

27   plaintiffs state claims in excess of $5,000,000 for the putative class and because plaintiffs are

28   citizens of California, while GM is a Delaware corporation.

**United States District Court**
For the Northern District of California

## ANALYSIS

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiffs' obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 125 S.Ct. 1955, 1964–65 (May 21, 2007) (internal citations omitted). "Conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. Rule 8(a)(2) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief." All material allegations of the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 340 (9th Cir. 1996).

Allegations of fraud, however, must meet the heightened pleading standards of Rule 9(b). These require allegations of particular facts going to the circumstances of the fraud, including time, place, persons, statements made and an explanation of how or why such statements are false or misleading. *In re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 n.7 (9th Cir. 1994) (en banc).

### 1.    CLRA.

The California Consumers Legal Remedies Act bans certain practices that the California legislature has deemed to be "unfair" or "deceptive." The CLRA, which plaintiffs cite in their brief, bars certain unfair acts "undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." In particular, the relevant portions of the act ban:

> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.

1    [(7)] Representing that goods or services are of a particular
2    standard, quality, or grade, or that goods are of a particular style or
     model, if they are of another.

3    Cal. Civ. Code § 1750(a)(5,7).

4    **A.    *Bardin* and *Daugherty* Do Not Preclude CLRA Claim For Unlawful
            Omission When A Duty To Disclose Exists**

5    GM bases much of its argument on two recent California Court of Appeal decisions with

6    similar fact patterns: *Daugherty v. American Honda Motor Co., Inc.*, 144 Cal. App. 4th 824

7    (2006), and *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255 (2006). Both dismissed

8    suits for car defects that only became apparent after the expiration of the car's warranty. In

9    *Bardin*, the plaintiffs sued under the CLRA for defects in their cars' exhaust manifolds.

10   DaimlerChrysler had built the manifolds with steel instead of cast iron, the more durable

11   industry standard, causing more frequent failure. No safety allegations were alleged: the

12   plaintiffs claimed only monetary damages. The *Bardin* court dismissed the plaintiffs' unlawful

13   omission claim on a demurrer, saying that the CLRA only bans omissions when a duty to

14   disclose exists. The plaintiffs "neither alleged facts showing [Honda] was bound to disclose its

15   use of tubular steel exhaust manifolds, nor alleged facts showing [Honda] ever gave any

16   information [that would have misled the public on this issue]." *Bardin*, 136 Cal. App. 4th at

17   1276.

18   In *Daugherty*, the plaintiffs presented a CLRA claim for engine defects that failed to

19   manifest themselves until long after the warranty had expired. According to plaintiffs'

20   allegations, certain Honda engines had a defect which would result in the dislodgement of a front

21   balancer shaft oil seal. The plaintiffs alleged no safety concerns, aside from the cost of replacing

22   damaged parts and engines. Holding that "nondisclosure [is not] applicable in the absence of a

23   related representation or disclosure obligation," the *Daugherty* court dispensed with the

24   plaintiffs' unlawful omission claim on a demurrer, since the defendant had made no

25   representations and had no duty to disclose an alleged defect. *Daugherty*, 144 Cal. App. 4th at

26   834. The court made particular note of the fact that "the complaint [was] devoid of factual

27   allegations showing any instance of physical injury or any safety concerns posed by the defect,"

28   so the alleged defect posed no "unreasonable risk." *Id.* at 836.

5

United States District Court
For the Northern District of California

1    In both of these cases, the court's decision to dismiss a claim for unlawful omission

2    rested on the lack of a duty to disclose. Both *Bardin* and *Daugherty* allow CLRA claims for

3    certain omissions, however, when the "omission [is] contrary to a representation actually made

4    by the defendant, or an omission of a fact the defendant was obliged to disclose." *Daugherty*,

5    144 Cal. App. 4th at 824. *Daugherty* emphasized that an "unreasonable" safety risk would lead

6    to a duty to disclose. Although plaintiffs do not allege any representations by GM about their

7    speedometers, outside of the warranty, they do successfully plead that a duty to disclose existed

8    here.

9    **B.    GM Had A Duty To Disclose The Alleged Defect**

10    Plaintiffs can therefore successfully pursue a CLRA claim, despite *Daugherty* and

11    *Bardin*, if GM was "obliged to disclose" the potential for problems with the speedometers in

12    certain vehicles. A failure to disclose or concealment can constitute actionable fraud in four

13    circumstances:

> (1) when the defendant is in a fiduciary relationship with the
> plaintiff; (2) when the defendant had exclusive knowledge of
> material facts not known to the plaintiff; (3) when the defendant
> actively conceals a material fact from the plaintiff; and (4) when the
> defendant makes partial representations but also suppresses some
> material fact.

*LiMandri v. Judkins*, 52 Cal. App. 4th 326, 337 (1997).

19    Plaintiffs do not plead a fiduciary relationship between themselves and GM. They

20    therefore fail to state a duty to disclose under the first *Judkins* factor. Plaintiffs also fail to allege

21    that any partial representations were actually made by defendant with regard to its speedometers

22    at the time the speedometers ceased to function properly. In the case of all three plaintiffs, a

23    warranty covered any defective components where problems occurred in the first three years or

24    36,000 miles of driving, whichever came first. However, all of the plaintiffs in this suit

25    experienced their first problems with the speedometers *after* the expiration of the warranty.

26    Although plaintiffs argue that defendant made "partial disclosures about the Trucks without

27    revealing the defective speedometer," they do not plead facts that suggest any such

28    representations occurred. Instead of alleging any representations on the part of GM, plaintiffs

      merely state that GM, when faced with questions about allegedly defective speedometers,

6

1   advised customers to "buy a service manual" or to get their speedometers "diagnosed" (Opp. 12).

2   Such advice conveys no information about the GM trucks or speedometers; it therefore cannot be

3   construed as a "partial representation" of anything to do with the trucks. Plaintiffs therefore fail

4   to plead a duty to disclose under the fourth *Judkins* factor.

5        This order now turns to the second and third *Judkins* factors for a duty to disclose. Both

6   require the existence of a material fact.

7        **C.    A Defective Speedometer Is Material.**

8        In order for non-disclosed information to be material, a plaintiff must show that "had the

9   omitted information been disclosed, one would have been aware of it and behaved differently."

10  *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993). Materiality, for CLRA claims, is judged by

11  the effect on a "reasonable consumer." *Consumer Advocates v. Echostar Satellite Corp.*, 113

12  Cal. App. 4th 1351, 1360 (2003).

13       In *Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1145 (N.D. Cal. 2005)

14  (Wilken, J.), summary judgment for the defendants was denied in a CLRA vehicle design case,

15  similar to the instant case, where the plaintiffs presented evidence that "they would not have

16  bought the cars had they known of the increased failure risk." Plaintiffs rely on *Chamberlan* to

17  establish that GM's failure to disclose information about its allegedly defective speedometers

18  was an omission of a material fact. Plaintiffs claim that, had they known of the alleged defect in

19  certain GM speedometers, they would have considered not purchasing the trucks or demanding a

20  lower price (Compl ¶ 48). Plaintiffs' factual allegations differentiate the present case from both

21  *Daugherty* and *Bardin*. Those two decisions argued that reasonable consumers would have had

22  no expectations about the failed parts: "in order to be deceived, members of the public must have

23  had an expectation or an assumption about the matter in question." *Daugherty*, 144 Cal. App.

24  4th at 838; *Bardin*, 136 Cal. App. 4th at 1275. Since the *Bardin* and *Daugherty* plaintiffs alleged

25  no consumer expectations about the matter in question, it could not be material.

26       Here, however, plaintiffs allege that they did, in fact, have expectations about the product

27  in question. Plaintiffs plead that a reasonable consumer would expect a speedometer to last for

28  the life of a vehicle (Compl. ¶ 49). Like in *Chamberlan*, plaintiffs also argue that had they

United States District Court
For the Northern District of California

7

United States District Court
For the Northern District of California

1    known of the possibility of a failed speedometer, they would not have paid the full asking price

2    for their GM vehicles.  Common experience supports plaintiffs' claim that a potential car buyer

3    would view as material a defective speedometer.  That a speedometer is prone to fail and to read

4    a different speed than the vehicle's actual speed, even a difference of ten miles per hour, would

5    be material to the reasonable consumer, driver and passenger.  Such a faulty speedometer easily

6    would lead to traveling at unsafe speeds and moving-violation penalties.

7        In support of their claim, plaintiffs present several pages of quotations containing

8    Internet complaints about GM speedometers, all for vehicles sold between 2003 and 2007.  The

9    amassed weight of these complaints suggests that plaintiffs' speedometer failures were not

10   isolated cases.  Instead, when viewed in the light most favorably to the plaintiffs, these collected

11   complaints suggest strongly that there was a defect in the design of certain GM speedometers in

12   the years from 2003 to 2007, which caused the speedometers to fail unexpectedly and without

13   warning.

14       Accordingly, under Rule 12(b)(6), plaintiffs plead adequate facts to show that the

15   possibility of a failed speedometer would be a material fact to a reasonable consumer.  This

16   conclusion of materiality would be, of course, subject to proof.[*]

17           **D.    Exclusive Knowledge Of A Material Fact.**

18       Under the second *Judkins* factor, a duty to disclose exists "when the defendant had

19   exclusive knowledge of material facts not known to the plaintiff." *Judkins*, 52 Cal. App. 4th at

20   337.  Plaintiffs allege that GM had exclusive knowledge of the putative defect in their

21   speedometers.  Plaintiffs claim that "[o]nly GM had access to the aggregate data from its

22   dealers[,] only GM had access to pre-release testing data[, and] only GM had access to the

23   numerous complaints from its customers."  When accepted as true for the purposes of this Rule

24   _____

25       [*]  Moreover, plaintiffs successfully allege that the potential for failed speedometers
         constitutes a safety hazard.  *Daugherty* stated that the "unreasonable risk alleged is merely . . . the
26       cost of repairs in the event the defect ever causes an oil leak." *Daugherty*, 144 Cal. App. 4th at
         836.  Here, plaintiffs allege a far greater risk: the risk of inadvertent speeding, driving at unsafe
27       speeds, and accidents.  These risks are far more "unreasonable" than the monetary consequences
         in *Daugherty*, and further strengthen plaintiffs' arguments that their speedometers were truly
28       defective.  Plaintiffs therefore state sufficient facts to survive a Rule 12(b)(6) motion
         to dismiss on their allegation of defective speedometers.

1    12(b)(6) motion, plaintiffs' material allegations suffice to state a claim that GM had exclusive

2    knowledge of the alleged defect in their speedometers. The record of complaints to GM between

3    2003 and 2007 show that GM was clearly aware of a problem with its speedometers; the record

4    makes it equally clear that customers only became aware of the problem if they actually

5    experienced it first-hand. Since, as plaintiffs argue, GM "was in a superior position to know"

6    that its speedometers might fail, plaintiffs successfully state a CLRA claim for omission of a

7    material fact which lay within GM's exclusive knowledge. This alone defeats GM's 12(b)(6)

8    motion to dismiss for failure to state a claim.

9        It is true that prospective purchasers, with access to the Internet, could have read the

10    many complaints about the failed speedometers (as quoted in the complaint). Some may have.

11    But GM is alleged to have *known* a lot more about the defective speedometers, including

12    information unavailable to the public. Many customers would not have performed an Internet

13    search before beginning a car search. Nor were they required to do so.

14        **E.    Active Concealment Of A Material Fact.**

15        The third *Judkins* factor creates a duty to disclose "when the defendant actively conceals

16    a material fact from the plaintiff." 52 Cal. App. 4th at 337. Plaintiffs allege that GM violated a

17    duty to disclose when it "actively concealed" an alleged defect in certain speedometers. To state

18    a claim for active concealment, a plaintiff must plead the following five elements:

19            (1) the defendant must have concealed or suppressed a material
            fact, (2) the defendant must have been under a duty to disclose the
20            fact to the plaintiff, (3) the defendant must have intentionally
            concealed or suppressed the fact with the intent to defraud the
21            plaintiff, (4) the plaintiff must have been unaware of the fact and
            would not have acted as he did if he had known of the concealed or
22            suppressed fact, and (5) as a result of the concealment or
            suppression of the fact, the plaintiff must have sustained damage.
23
24    *Lovejoy v. AT & T Corp.,* 119 Cal. App. 4th 151, 157 (2004).

25        Plaintiffs support their active concealment claim with several different factual

26    allegations. First, the fact that various GM customers complained between 2003 and 2007 yet

27    GM never made any attempt to notify other customers or effect a recall, suggests that GM may

28    have attempted to actively conceal the alleged defect in their speedometers. Plaintiffs also argue

    that "[w]here GM replaced the Trucks' speedometers pursuant to warranty provisions, GM

United States District Court
For the Northern District of California

9

1    utilized equally defective speedometers and speedometer mechanisms such that the defect was

2    not corrected even though GM informed consumers that it was" (Compl. ¶ 24). This claim

3    suggests that GM tried to gloss over the problems with its speedometers by replacing broken

4    ones with the exact same model of speedometer, thereby giving the impression that any defects

5    were unique cases. This might very well constitute active concealment of a systematic problem.

6    Since plaintiffs provide some factual grounds for their claim of active concealment, and

7    considering that plaintiffs adequately plead a claim that the GM speedometers were defective,

8    plaintiffs' active concealment claim survives this Rule 12(b)(6) motion to dismiss.

9        In sum, plaintiffs provide sufficient facts to state a claim under the CLRA. Although GM

10   made no overt representations that suggested plaintiffs' speedometers would last beyond a

11   certain point, it had a duty to disclose any known defects in the speedometers. Under the CLRA,

12   plaintiffs adequately plead both that GM failed to disclose a material fact within its exclusive

13   control and that GM actively concealed the existence of a known defect in their speedometers.

14   GM's motion to dismiss plaintiffs' CLRA claims is therefore **DENIED**.

15       2.    **SECTION 17200.**

16       Plaintiffs claim that GM violated California's Unfair Competition Law. The UCL

17   prohibits acts or practices which are (1) fraudulent, (2) unlawful, or (3) unfair. Cal. Bus. & Prof.

18   Code § 17200. Plaintiffs adequately plead claims under all three of these prongs of the UCL.

19           A.    **Fraudulent Conduct.**

20       In order to state a fraud claim under the UCL, a plaintiff must show that "members of the

21   public are likely to be deceived." *Bardin v. Daimler Chrysler Corporation*, 136 Cal. App. 4th

22   1255, 1261 (2006). Plaintiffs allege that members of the public are likely to be deceived because

23   GM violated its duty to disclose the potential for known defects in its speedometers. Relying on

24   *Chamberlan*, plaintiffs argue that a reasonable customer would expect a speedometer to last for

25   the lifetime of a car and would have reconsidered the purchase if he or she had known of the

26   alleged defect. *See Chamberlan*, 369 F. Supp. 2d at 1145. As stated, plaintiffs adequately plead

27   that GM had a duty to disclose the existence of a known defect to its customers. If GM had this

28   duty, yet failed to follow through with it, members of the public would very likely be deceived.

United States District Court
For the Northern District of California

10

1   Therefore, when viewing plaintiffs' material allegations in the light most favorable to them,

2   plaintiffs succeed in stating a fraudulent conduct claim under the UCL.

3                    **B.    Unlawful Practices.**

4           Plaintiffs' unlawful practices claim is premised on a violation of the CLRA:  plaintiffs

5   allege that GM committed unlawful practices by violating the CLRA.  As previously discussed,

6   plaintiffs successfully plead violations of the CLRA.  Although GM made no representations

7   about its speedometers, other than its warranty, plaintiffs successfully plead that GM violated the

8   CLRA by breaching its duty to disclose information about its defective speedometers.

9   Therefore, when taking all of plaintiffs' allegations as true, GM has committed an unlawful

10  practice under the UCL.

11                   **C.    Unfair Practices.**

12          A business practice constitutes unfair competition "if it is forbidden by any law, be it

13  civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made[,] or if it is

14  unfair, that is, if it offends an established public policy or . . . is immoral, unethical, oppressive,

15  unscrupulous or substantially injurious to consumers." *People v. Duz-Mor Diagnostic*

16  *Laboratory, Inc.*, 68 Cal. App. 4th 654, 658 (1998) (internal quotations and citations omitted).

17  Plaintiffs plead only that GM's business practices were unfair insofar as GM allegedly violated

18  the CLRA.  As shown above, plaintiffs allege sufficient facts to state a CLRA claim; although

19  they do not plead that GM made any representations about the quality of its speedometers,

20  outside of its warranty, they plead sufficient facts to show that GM failed to meet its duty to

21  disclose any known and material defects.  This failure to disclose constitutes a violation of the

22  CLRA, which in turn can be an unfair practice under the UCL.  Plaintiffs therefore state an

23  unfair practices claim under the UCL.

24          Accordingly, defendant's motion to dismiss is **DENIED** as to plaintiffs' unfair competition

25  claims.

26               **3.    FRAUD BY OMISSION.**

27          Allegations of fraud must meet the heightened pleading standards of Rule 9(b), which

28  requires "specificity including an account of the time, place, and specific content of the false

**United States District Court**
For the Northern District of California

11

1    representations as well as the identities of the parties to the misrepresentations." *Swartz v.*

2    *KPMG LLP*, 476 F.3d 765, 764 (9th Cir. 2007). Clearly, a plaintiff in a fraud by omission suit

3    will not be able to specify the time, place, and specific content of an omission as precisely as

4    would a plaintiff in a false representation claim. Another judge in this district has recognized

5    that a fraud by omission claim can succeed without the same level of specificity required by a

6    normal fraud claim. *See, e.g., Washington v. Baenziger*, 673 F.Supp. 1478, 1482 (N.D. Cal.

7    1987) (Weigel, J.) ("Where the fraud consists of omissions on the part of the defendants, the

8    plaintiff may find alternative ways to plead the particular circumstances of the fraud. [F]or

9    example, a plaintiff cannot plead either the specific time of the omission or the place, as he is not

10    alleging an act, but a failure to act.") (internal citations and quotations omitted); *see also David*

11    *K. Lindemuth Co. v. Shannon Financial Corp.*, 637 F.Supp. 991, 995 (N.D. Cal. 1986) (Weigel,

12    J.). Accordingly, plaintiffs' fraud by omission claim will not be dismissed purely for failure to

13    precisely state the time and place of the fraudulent conduct.

14         The elements of fraud in California are: "(1) a misrepresentation (false representation,

15    concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e.,

16    to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co.*

17    *v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004). Plaintiffs allege sufficient facts that, if taken as true,

18    suggest that GM had a duty to disclose information about its defective speedometers. Plaintiffs

19    also allege facts that show that defendant actively concealed and failed to disclose material facts

20    that were in its exclusive knowledge. Plaintiffs show knowledge of falsity and intent to defraud

21    by pleading facts that demonstrate that GM knew about the alleged defects, yet did nothing to fix

22    them or to alert customers. The justifiable reliance element of the fraud by omission claim is

23    easily satisfied. As pleaded by plaintiffs, a "reasonable customer" would not have paid the

24    asking price had it been disclosed that the speedometer was defective; similarly, this same

25    customer may have justifiably relied on GM's failure to disclose defects in the speedometer.

26    Finally, plaintiffs allege damages for the expense of replacing their speedometers.

27         Plaintiffs adequately state a claim of fraud by omission. They allege that GM was bound

28    by a duty to disclose material facts about its speedometers from 2003 to 2007. GM failed to

12

1   disclose this information, and plaintiffs reasonably claim that they suffered damages after

2   justifiably relying on GM's failure to disclose any defects with the speedometers. GM's motion

3   to dismiss the fraud by omission claim under Rules 12(b)(6) and 9(b) is therefore **DENIED**.

4        **4.     UNJUST ENRICHMENT.**

5        Plaintiffs' fourth claim is for unjust enrichment. California courts appear to be split on

6   whether unjust enrichment can be an independent claim or merely an equitable remedy. "The

7   phrase 'unjust enrichment' does not describe a theory of recovery, but an effect: the result of a

8   failure to make restitution under circumstances where it is equitable to do so." *Melchoir v. New*

9   *Line Productions, Inc.*, 106 Cal. App. 4th 779, 793 (2003) (quoting *Lauriedale Assocs. Ltd. v.*

10  *Wilson*, 7 Cal. App. 4th 1439, 1448 (1992)). Other California courts, however, have held that a

11  plaintiff may state a claim for unjust enrichment, particularly where their claim seeks restitution

12  where other remedies are inadequate. *See Ghirardo v. Antonioli*, 14 Cal. 4th 39, 50 (1996).

13       This order holds that the sole remedies available for the violations alleged have been

14  discussed above, so there will be no occasion for resort to unjust enrichment. Defendant's

15  motion to dismiss is **GRANTED** as to this claim.

16       **5.     STATUTE OF LIMITATIONS.**

17       Finally, GM argues that Falk and Kratzer's CLRA and fraud claims are barred by the

18  applicable statutes of limitations. Under the CLRA, "[a]ny action brought under the specific

19  provisions of Section 1770 shall be commenced not more than three years from the date of the

20  commission of such method, act or practice." Cal. Civ. Code § 1783. The statute of limitations

21  for a claim sounding in fraud is similarly three years and "is not deemed to have accrued until

22  the discovery, by the aggrieved party, of the facts constituting fraud or mistake." Cal. Civ. Proc.

23  Code § 338(d). Both Falk and Kratzer purchased their GM products in 2003 (Compl. ¶¶ 7–8).

24       GM argues in effect that plaintiffs Falk and Kratzer should have been aware of the

25  alleged defect in the speedometer at the time they purchased their cars. The crux of defendant's

26  argument is that plaintiffs plead that GM was on notice of the defect in the speedometers as early

27  as 2003. Plaintiffs also plead that a number of Internet postings should have alerted GM to the

28  defect. Defendant contends that if such information were posted on a public website, plaintiffs

United States District Court
For the Northern District of California

13

1  should have had access to it at the same time GM did. Defendant's argument ignores that none

2  of the Internet postings quoted in the complaint showed what dates they were posted or when the

3  problems occurred, save for an email from GM dated in 2006 (*id.* at ¶ 21). Plaintiffs also plead

4  that GM, as the company who produced the trucks, had superior knowledge and should have

5  known that the speedometers were defective. Accordingly, defendant's argument that plaintiffs

6  should have been on notice of the defect when they purchased the vehicles fails at the pleading

7  stage. Plaintiffs Falk and Kratzer's claims are not barred by the statute of limitations, at least at

8  the pleading stage.

9                                   **CONCLUSION**

10      In closing, it is worth saying that ordinarily an express warranty begins and ends the

11  manufacturer's duty to replace an item like the one in question. Here, however, the large number

12  of articulate and credible Internet postings set forth in the complaint strongly indicates that GM

13  knew of the problem and very likely had far more information on a material defect. At least at

14  the pleading stage, this complaint states a claim that GM knew and concealed that its

15  speedometers were defective and likely to fail far more often than expected by the consuming

16  public. Discovery may or may not bear this claim out. But enough is alleged to authorize

17  plaintiffs and their counsel to proceed to take discovery.

18      For the reasons given, defendant's motion to dismiss plaintiffs' unjust enrichment claim

19  is **GRANTED** without leave to amend. Plaintiffs, however, allege sufficient factual support for all

20  of their other claims. Although *Daugherty* and *Bardin* bar CLRA claims for omissions when

21  there is no duty to disclose and when defendants have made no representations to the contrary,

22  plaintiffs adequately plead that GM had a duty to disclose here, which it violated. Defendant's

23  motion to dismiss under Rules 12(b)(6) and 9(b) is therefore **DENIED** as to plaintiffs' CLRA,

24  UCL and fraud by omission claims. Discovery may begin immediately.

25      **IT IS SO ORDERED.**

26

27  Dated: July 3, 2007.

28                                    _____
                                      WILLIAM ALSUP
                                      UNITED STATES DISTRICT JUDGE

— EXHIBIT H —

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KEVIN ZWICKER and TERESA K. PALMER
on behalf of themselves and all others similarly
situated,

              Plaintiffs,

    v.

GENERAL MOTORS CORPORATION, a
Delaware corporation,

              Defendant.

CASE NO. C07-0291-JCC

ORDER

## I.    INTRODUCTION

This matter comes before the Court on Defendant's Motion to Dismiss. (Dkt. No. 21.) After considering the parties' relevant submissions on the matter and determining that oral argument is unnecessary the Court rules as follows.

## II.    BACKGROUND AND FACTS

Plaintiffs Kevin Zwicker and Teresa K. Palmer filed a class action against Defendant General Motors ("GM"), asserting that GM provided them with defective speedometers.

Plaintiff Zwicker alleges that his 2004 Chevy Suburban gradually failed, registering only 30 miles per hour when he was actually going 60 miles per hour. (First Am. Compl. ¶ 2.1 (Dkt. No. 10).) Plaintiff

ORDER – 1

1   Zwicker claims that he incurred approximately $100 replacing the faulty device. (*Id.*) Plaintiff Palmer

2   claims that her 2003 Chevy Suburban speedometer likewise failed, causing her to spend $92 in court

3   costs for a speeding ticket she received when the speedometer indicated she was traveling near the posted

4   limit, and that she had to pay approximately $109 in replacement costs. (*Id.* ¶ 2.2.)

5       Plaintiffs also present numerous postings from Internet discussion boards which detail similar

6   problems with speedometers in other GM vehicles. For example, Plaintiffs point to an Internet posting in

7   which a person stated he had a near-accident when his speedometer registered 35 miles per hour when it

8   was actually moving closer to 65 miles per hour. (*Id.* ¶ 6.5.) Plaintiffs' First Amended Complaint catalogs

9   testimonials of individuals who notified GM personnel of these speedometer problems. (*Id.*)

10       Plaintiffs allege that the faulty speedometers pose a risk of significant injury or death. They also

11   claim GM actively concealed the defects and instituted a class action lawsuit for "actionable

12   misrepresentation," a violation of the Washington Consumer Protection Act ("CPA"), unjust enrichment,

13   and breach of express and implied warranties. Plaintiffs subsequently abandoned their warranty-related

14   claims. (Pls.' Opp'n 1 n.1 (Dkt. No. 30).)

15   **III.    STANDARD OF REVIEW**

16       To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state

17   a claim, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the

18   assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct.

19   1955, 1959 (2007). Thus, dismissal is proper "based on the lack of a cognizable legal theory or the

20   absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*,

21   901 F.2d 696, 699 (9th Cir. 1990).

22       The Federal Rules generally require "a short and plain statement of the claim showing that the

23   pleader is entitled to relief." Fed. R. Civ. P. 8(a). Allegations of fraud, however, must meet a heightened

24   pleading requirement; the circumstances constituting fraud or mistake must be stated with particularity.

25   Fed. R. Civ. P. 9(b).

26   ORDER – 2

1  IV.    **ANALYSIS**

2       A.    **"Actionable Misrepresentation"**

3       Plaintiffs' claim for "actionable misrepresentation" actually consists of two separate claims: one

4  for negligent misrepresentation and the other for fraudulent concealment. As different legal standards

5  apply to each claim, they will be addressed separately.

6       1.    **Negligent Misrepresentation**

7       Plaintiffs allege that GM made negligent misrepresentations by failing to inform its customers

8  about known speedometer defects. "The elements of negligent misrepresentation are (1) a false statement

9  (2) made to induce a business transaction (3) upon which the other party justifiably relies." *Ross v. Ticor*

10  *Title Ins. Co.*, 143 P.3d 885, 889 (Wash. Ct. App. 2006). A negligent omission satisfies the first element,

11  provided that a party has a duty to disclose the information. *Id.*; *Van Dinter v. Orr*, 138 P.3d 608, 610

12  (Wash. 2006). Such a duty exists "where a seller has knowledge of a material fact not easily discoverable

13  by the buyer." *Colonial Imports, Inc. v. Carlton Northwest, Inc.*, 853 P.2d 913, 917 (Wash. 1993)

14  (quoting *Favors v. Matzke*, 770 P.2d 686, 690 (Wash. Ct. App. 1989)). Here, Plaintiffs claim that GM

15  knew of widespread speedometer defects not easily discoverable by consumers. Plaintiffs further allege

16  that they relied on GM's silence to their detriment by purchasing automobiles they otherwise would not

17  have, or by paying an inflated price for these vehicles.

18       Defendant argues in response that the warranty allocated the risk of loss between the parties and

19  therefore Plaintiffs' negligent misrepresentation claim is barred by the economic loss rule. "[T]he purpose

20  of the economic loss rule is to bar recovery for alleged breach of tort duties where a contractual

21  relationship exists and the losses are economic losses." *Alejandre v. Bull*, 153 P.3d 864, 868 (Wash.

22  2007). "If the economic loss rule applies, the party will be held to contract remedies, regardless of how

23  the plaintiff characterizes the claims." *Id.* GM contends that the warranty here allocated the risk of loss

24  such that the risk of economic damages prior to the expiration of the warranty would be borne by GM

25  whereas the risk of parts failure after that time would be borne by the individual consumers.

26  ORDER – 3

1     Washington courts apply two alternative tests to determine whether or not certain damages are

2  "more than pure economic loss, unrecoverable under the act." *Touchet Valley Grain Growers, Inc. v.*

3  *Opp. & Seibold General Const., Inc.*, 831 P.2d 724, 733 (Wash. 1992). The first of these is the "sudden

4  and dangerous test." Under that test, "[i]f the failure is the result of a sudden and dangerous event, it is

5  remediable under tort principles." *Id.* The second is the "evaluative approach,"which "proceeds on the

6  theory that a product user should not have to suffer a calamitous event before earning his remedy in tort."

7  *Id.* It "examines interrelated factors such as the nature of the defect, the type of risk, and the manner in

8  which the injury arose." *Id.*

9     Both tests are easily met here. As both common sense and Plaintiffs' factual allegations bear out,

10  the failure of a speedometer is clearly a "sudden and dangerous event." Such a failure causes grave risk of

11  collision to motorists who may unknowingly drive dangerously out of sync with the posted speed limit.

12  These allegations likewise satisfy the more evaluative approach. The "nature of the defect" is such that it

13  implicates the "safety insurance policies of tort law" much more so than it does the "'expectation-bargain

14  protection' policies of contract law." *See Staton Hills Winery Co., Ltd. v. Collons*, 980 P.2d 784, 787-88

15  (Wash. Ct. App. 1999) (citing *Wash. Water Power Co. v. Graybar Elec. Co.*, 774 P.2d 1199, 1207-08

16  (Wash. 1989)). Further, the "risk presented" implicates tort policy because "significant risk to persons . . .

17  always implicate tort policy" and because the risk that a speedometer would suddenly fail contrary to

18  common experience is unforeseeable. *See id.* at 788. Finally, the "manner of injury alleged" is such that,

19  assuming Plaintiffs' allegations as true for purposes of this Rule 12(b)(6) motion, it is a mere fortuity that

20  a known plaintiff has not been injured. *See id.* at 789. Thus, both the "sudden and dangerous" and the

21  "evaluative approach" tests preclude application of the economic loss rule to bar negligent

22  misrepresentation claims despite the existence of the warranty.

23     GM argues that the "sudden and dangerous" and "evaluative approach" tests only apply to

24  products liability cases and not to contract-based causes of action. (Def.'s Reply 2-3 (Dkt. No. 31).) This

25  argument is unpersuasive. The Washington Supreme Court has explicitly attempted to "align the common

26  ORDER – 4

1  law rule on 'economic loss' with the Legislature's application of the rule under the [Washington Product

2  Liability Actions Act]." *Alejandre*, 153 P.3d at 869 (citing *Berschauer/Phillips Const. Co. v. Seattle Sch.*

3  *Dist. No. 1*, 881 P.2d 986, 993 (Wash. 1994) (internal quotations omitted)). Thus, there is no reason to

4  think that Washington contract law would apply the bright-line approach to the economic loss rule it so

5  "explicitly rejected" in the products liability context. *Touchet Valley Grain Growers*, 831 P.2d at 733.

6  Accordingly, the economic loss rule does not bar Plaintiffs' negligent misrepresentation claim.

7        In GM's discussion of the CPA claim, it further argues that the duty to disclose is limited to

8  situations where a *seller* has knowledge of a material fact not easily discoverable by the buyer. (Def.'s

9  Reply 7-8 (Dkt. No. 31).) GM asserts it is not a "seller" because it does not sell directly to consumers,

10  and therefore it has no duty to disclose pursuant to any seller-buyer relationship. (*Id.*)

11        This Court can find no principled distinction for such a position. "The duty to disclose in a

12  business transaction arises if imposed by a fiduciary relationship or other similar relationship of trust or

13  confidence or if necessary to prevent a partial or ambiguous statement of facts from being misleading."

14  *Van Dinter v. Orr*, 138 P.3d 608, 610 (Wash. 2006). A manufacturer that sells products indirectly

15  through other retailers still has a relationship of trust and confidence with consumers regarding those

16  products, a relationship analogous to that of a company that sells directly to consumers. When such a

17  manufacturer has superior information regarding defects that are not readily ascertainable to customers, it

18  has a duty to disclose that information

19        Accordingly, GM's motion to dismiss on Plaintiffs' negligent misrepresentation claim is denied.

20        **2.    Fraudulent Concealment**

21        Plaintiffs also assert that GM fraudulently concealed the nature of the speedometer defect from

22  consumers. GM moves to dismiss this claim as failing to meet the heightened-pleading requirement under

23  Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that fraud be pled with particularity, "including

24  an account of the 'time, place, and specific content of the false representations as well as the identities of

25  the parties to the misrepresentations.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)

26  ORDER – 5

1  (citations omitted). "To comply with Rule 9(b), allegations of fraud must be specific enough to give

2  defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that

3  they can defend against the charge and not just deny that they have done anything wrong." *Id.*

4  (quotations omitted). GM argues that Plaintiffs have not met 9(b)'s requirement because they "fail to

5  identify any 'misrepresentation' by anyone at GM." (Def.'s Mot. 2 (Dkt. No. 21).)

6        GM's argument overstates Rule 9(b)'s requirements in fraudulent omission cases. In *Falk v.*

7  *General Motors Corp*, the Northern District of California rejected an identical argument in an

8  indistinguishable defective speedometer case, noting that "a plaintiff in a fraud by omission suit will not be

9  able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a

10  false representation claim." *Falk v. General Motors Corp.*, No. C 07-01731 WHA, 2007 WL 1970123, at

11  *8 (N.D. Cal. July 3, 2007). This Court finds the reasoning of *Falk* on the exact issue before this Court

12  persuasive and holds that the heightened pleading requirement is relaxed in cases of fraudulent omissions.

13        GM likewise argues that Plaintiffs have not identified specific GM employees who allegedly failed

14  to disclose relevant information. However, Rule 9(b)'s requirement is also relaxed "in cases of corporate

15  fraud" where "plaintiffs will not have personal knowledge of all of the underlying facts" such as the

16  identities of particular defendants. *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir.

17  1989).

18        Plaintiffs have sufficiently pled their fraud claim under the previously discussed standards. To

19  establish fraud under Washington law, "[t]he plaintiff may affirmatively plead and prove the nine elements

20  of fraud or may simply show that the defendant breached an affirmative duty to disclose a material fact."

21  *Crisman v. Crisman*, 931 P.2d 163, 166 (Wash. Ct. App. 1997). Plaintiffs have pled specific facts that

22  GM breached its duty to disclose a material defect in the speedometers, as discussed in the negligent

23  misrepresentation section of this Order.

24        Similarly, Plaintiffs have also pled all of the nine elements of fraud. Plaintiffs allege: (1)

25  representation of an existing fact due to the omission of the speedometer defect; (2) materiality because

26  ORDER – 6

1   the malfunctioning speedometers pose grave safety risks; (3) falsity because the speedometers were

2   defective; (4) GM's knowledge of its falsity; (5) GM's intent that its omission be relied upon in order to

3   bolster sales; (6) Plaintiffs' ignorance of the falsity; (7) Plaintiffs' reliance on the truth of the

4   representation in that they would not have purchased the vehicles or paid less for them; (8) Plaintiffs'

5   right to rely upon it based on reasonable consumer expectations that speedometers will not be designed

6   such that they regularly fail after a few years; and (9) damages suffered by Plaintiffs in the form of

7   replacement and other costs. *See Stiley v. Block*, 925 P.2d 194, 204 (Wash. 1996) (listing the nine

8   elements of fraud).

9          GM's arguments that two of these nine elements have not been met are unpersuasive. First, GM's

10  argument that it did not make any affirmative misrepresentation ignores the fact that Plaintiffs are

11  asserting an omission claim. Second, GM's argument that Defendant did not specifically plead reliance is

12  contradicted by the factual allegations in the First Amended Complaint. (First Am. Compl. ¶ 9.5. (Dkt.

13  No. 10) ("The facts concealed or not disclosed by Defendant to Plaintiffs and the Class are material facts

14  in that a reasonable person would have considered those facts to be important in deciding whether or not

15  to purchase Defendant's Trucks. Had Plaintiffs and the Class known the defective nature of the

16  speedometers, they would not have purchased them or would have paid less for them.").) Thus, Plaintiffs

17  have sufficiently pled a fraudulent concealment claim under Rule 9(b).

18  **B.    CPA Claim**

19         Defendant moves for summary judgment on the CPA claim. The elements of a CPA claim are:

20  "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4)

21  injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training Stables,*

22  *Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986).

23         GM first argues that Plaintiffs did not engage in any unfair or deceptive conduct because "[a]

24  failure to disclose that a component part may fail in the future cannot be deceptive unless plaintiffs

25  actually and reasonably believed to the contrary – *i.e.* that parts would <u>never fail</u>. (Def.'s Reply 8

26  ORDER – 7

1   (emphasis in original) (Dkt. No. 31).) This argument is meritless. Plaintiffs are not asserting a one-off

2   post-warranty failure of an automobile component. Rather, they assert a systematic failure of a specific

3   automotive part of which GM was allegedly aware and concealed from the public. Thus, this Court easily

4   finds that Plaintiffs pled the requisite unfair or deceptive act. *See Falk*, 2007 WL 1970123, at *7.

5        Second, GM argues that the Plaintiffs have not pled proximate cause because "Plaintiffs cannot

6   reasonably claim they would not have purchased their vehicles if they knew the speedometers had a

7   chance of failing post-warranty." (Def.'s Reply 9 (Dkt. No. 31).) However, Plaintiffs specifically pled that

8   had GM informed them about the nature of the speedometer defect they would either not have purchased

9   the cars or paid less for them. (First Am. Compl. ¶ 9.5 (Dkt. No. 10).) Common sense also dictates they

10  may have taken steps to avoid damages other than the sheer costs of repair, such as Plaintiff Palmer's

11  court fees for her speeding ticket, by fixing the device prior to a full-fledged malfunction.

12       **C.    Unjust Enrichment**

13       GM argues that the written warranty precludes a claim for unjust enrichment. "[W]here the rights

14  of the parties are governed by an express and enforcible [sic] contract, the law will not imply another or

15  different contract." *Chandler v. Wash. Toll Bridge Authority*, 137 P.2d 97, 105 (Wash. 1943). *See also*

16  *In re Price/Costco Shareholder Litig,*, No. C94-18747C, 1995 WL 786631, at *6 (W.D. Wash. Oct. 30,

17  1995) (Coughenour J) ("The Court agrees with PE that, to the extent that the obligations of PE and

18  PriceCostco to one another were defined in an express, valid, and enforceable contract, the theory of

19  unjust enrichment or implied contract is probably unavailable to redefine that relationship.") Here, the

20  warranty covered the subject matter of the unjust enrichment claim—the amount of money that the

21  parties would have had to spend on repairs in the event of a part malfunction. Plaintiffs' contractually

22  based remedies are thus limited to those actually available via the express warranty contract.

23       Plaintiffs argue that *Chandler* does not apply where the underlying contract is unenforceable.

24  However, Plaintiffs explicitly abandoned their warranty claims, which provided the only basis for their

25  unconscionability arguments. They cannot now rely on those abandoned claims to prop up their unjust

26  ORDER – 8

1    enrichment claim.

2           Accordingly, Plaintiffs' contractually based remedies are limited to those available through the

3    warranty (which they have abandoned), and their unjust enrichment claim is hereby dismissed.

4    **V.      CONCLUSION**

5           Defendant GM's motion to dismiss is hereby GRANTED IN PART and DENIED IN PART.

6    Plaintiffs' unjust enrichment claim is hereby dismissed. All other claims remain in this action. The stay on

7    discovery is hereby LIFTED.

8

9           SO ORDERED this 26th day of July, 2007.

10

11

12

13    John C. Coughenour
      United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26    ORDER – 9